## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

MARGARET D. RABER,
2119 S Street, N.W.
Washington, D.C.  20008,

                     Plaintiff,

    v.

BUDGET EXPRESS MOVING & STORAGE
INC. d/b/a LOS ANGELES TRANSFER &
STORAGE,
7753 Densmore Avenue
Van Nuys, California  91406
(U.S. DOT # 1159748)

MONSTER MOVING LLC
2759 Old Higgins Road
Elk Grove Village, Illinois  60007
(U.S. DOT # 3341080)

MAJOR LEAGUE MOVERS INC.
5601 W Missouri Ave Lot 131
Glendale, Arizona  85301
(U.S. DOT # 3932365)

and

MAJOR LEAGUE MOVERS, INC.
5334 Lindley Ave., Ste. 116
Encino, California  91316

                  Defendants.

Civil Action No. _____

## COMPLAINT

1.    Plaintiff Margaret Raber trusted Defendants to transport her family's belongings during an interstate move from California to the District of Columbia.  That trust was misplaced.

2.    Before unloading the moving truck in the District of Columbia, Defendants' driver held Ms. Raber's household goods hostage to extort full payment, refused to let her or her husband speak with a supervisor, and left the scene before resolving the legally required delivery documents.  Only about half of the household goods loaded on the truck in California actually arrived in the District.  Ms. Raber never recovered these lost items, including irreplaceable items with sentimental value.  Despite filing a claim with the movers' claims processer, Ms. Raber has never received even a partial refund of her payments to Defendants, much less compensation for the value of her lost belongings.

3.    Despite advertising themselves as professional and trusted movers, Defendants violated federal law.

## THE PARTIES

4.    Plaintiff Margaret Raber is an individual who resides with her husband in the District of Columbia.

5.    Defendant Budget Express Moving & Storage Inc d/b/a Los Angeles Transfer & Storage ("LA Transfer") is incorporated in California and has its principal place of business in California.  LA Transfer provides interstate transportation and storage of household goods.  LA Transfer is a motor common carrier registered with the U.S. Department of Transportation Federal Motor Carrier Safety Administration ("FMCSA") under U.S. DOT # 1159748.

6.    Defendant Monster Moving LLC is a company incorporated in Illinois and has its principal place of business in Illinois.  Monster Moving provides interstate transportation and

storage of household goods.  Monster Moving is a motor common carrier registered with the FMCSA under U.S. DOT # 3341080.

7.      Defendant Major League Movers Inc. ("Major League Arizona") is a company incorporated in Arizona with a principal place of business in Arizona.  Major League Arizona is registered with the FMCSA under U.S. DOT # 3932365.

8.      Defendant Major League Movers, Inc. ("Major League California") is a company incorporated in California with a principal place of business in California.  Major League California is not registered with the FMCSA.

9.      Major League California and Major League Arizona (collectively, "Major League Companies") share the same Chief Executive Officer and Director, Nolan Chipongian.  On information and belief, Major League Arizona is the corporate successor of Major League California.

## JURISDICTION AND VENUE

10.      This Court has subject matter jurisdiction over this action under 28 U.S.C. § 1337, given that the action arises under an Act of Congress regulating commerce under 49 U.S.C. § 14706(d)(2).  The amount in controversy for each receipt or bill of lading exceeds $10,000.00, exclusive of interest and costs.

11.      Defendants are subject to jurisdiction under 49 U.S.C. § 14706 as motor common carriers providing transportation and/or service between two places in separate states.  49 U.S.C. § 13501(a); 49 U.S.C. § 14706.  Defendants provided transportation and/or service between California and the District of Columbia.

12.     This Court has personal jurisdiction over Defendants because this action arises

from work and services performed by Defendants and their agents in the District of Columbia.

D.C. Code § 13-423(a).

13.     Venue is proper in this Court under 49 U.S.C. § 14706(d)(2) because a civil

action is being brought against motor carriers alleged to have caused loss or damage in the

judicial district in which such loss or damage is alleged to have occurred.  Venue is also proper

in this Court under 28 U.S.C. § 1391(b)(2) because a substantial part of the events giving rise to

the claims occurred in the District of Columbia.

## ALLEGATIONS OF FACT

14.     In August 2021, Ms. Raber obtained a binding estimate for a moving contract

from Monster Moving for her and her husband's expected move from Santa Barbara, California

to 2119 S Street, NW, in the District of Columbia (the "Move").  The binding estimate for the

Move was $6,850.00.  The Move was to commence between January 18–20, 2022.

15.     As part of receiving a binding estimate for the Move, Ms. Raber provided an

inventory of household goods to Monster Moving.  Monster Moving valued the inventoried

goods at $29,400.00 and included this valuation on the binding estimate.

16.     Ms. Raber paid $693.75 for the binding estimate in the form of a deposit on the

Move.  The deposit was refundable until September 9, 2021, and allowed inventory to be

changed until December 8, 2021.

17.     In January 2022, months after the deposit was paid, weeks after the inventory was

set, and days before the Move, Monster Moving informed Ms. Raber that it would be

subcontracting to an outside moving company, Defendant LA Transfer.

18.     LA Transfer contacted Ms. Raber and presented a document citing the inventory and binding estimate price previously provided by Monster Moving in the August 2021 binding estimate.

19.     On January 20, 2022, the day of their cross-country move, LA Transfer presented Ms. Raber with a new "Interstate Bill of Lading Contract and Order for Service" ("Bill of Lading").

20.     Notwithstanding printed terms on the Bill of Lading describing required forms of payment, a different method of payment was handwritten on the Bill of Lading provided to Ms. Raber on the day of the move.  Payment was to be made by Zelle, a digital peer-to-peer payment system that lacks the customer payment protections of other forms of payment.

21.     Ms. Raber was instructed to make a payment by Zelle to the account of Major League Movers Inc.  Ms. Raber transferred $2,633 via Zelle to this account.  On information and belief, the bank account belongs to one or both Major League Companies.

22.     The Major League Companies exerted control over the other Defendants' drivers by demanding payment directly from Ms. Raber via Zelle, in contravention of the written terms of the Bill of Lading.

23.     LA Transfer and its agents instructed Ms. Raber to keep a copy of the new Bill of Lading as the official contract for her Move.

24.     Ms. Raber also completed a Household Goods Descriptive Inventory at the time of pickup in California.  The Household Goods Descriptive Inventory included a list of Ms. Raber's articles that Defendants transported in interstate commerce.  The Household Goods Descriptive Inventory was incorporated by reference into the Bill of Lading and became part of the contract between Ms. Raber and Defendants.

25.     Interstate carriers certified by the Department of Transportation must maintain "liability for household goods that are lost, damaged, destroyed, or otherwise not delivered to the final destination [in] an amount equal to the replacement value of such goods, subject to a maximum amount equal to the declared value of the shipment" unless a carrier receives a waiver in writing by the shipper. 49 U.S.C. § 14706(f)(2)–(3).

26.     The Bill of Lading did not contain the Valuation Statement or selection of liability as required in the Surface Transportation Board's Released Rates of Motor Carrier Shipments of Household Goods.  Accordingly, the Bill of Lading does not contain a signed waiver of other than full-value protection.

27.     In fact, Section 4 of the Bill of Lading explains that "[u]nless you specifically agree to other arrangements, the mover must assume liability for the entire shipment based upon [replacement] option."

28.     In Section 7 of the Bill of Lading, Defendants "guarantee[d] delivery to take place within 30 business days of the date first available for delivery."

29.     The first available date of delivery was written in the Bill of Lading as January 24, 2022.  Thirty business days from January 24, 2022 is March 8, 2022.

30.     On March 14, 2022, approximately a week after the guaranteed date of delivery, Defendant's agent emailed Ms. Raber to note that the delivery "will be en route tomorrow morning" and that the driver "will call you 24 hours prior to delivery with his ETA."

31.     Defendants did not deliver any of Plaintiff's household goods until March 26, 2022, more than two weeks after the guaranteed delivery date and more than two months after the first date of delivery listed on the Bill of Lading.  Ms. Raber and her husband were without the entirety of their household goods during this time.

32.     On the afternoon of Saturday, March 26, 2022, Defendants' agent delivery driver, "Adam," arrived at 2119 S Street, NW to deliver Ms. Raber's household possessions.

33.     On information and belief, "Adam" is Adam Yontov.  In 2016, Mr. Yontov was arrested for brandishing a firearm at his roommate.  In 2017, Mr. Yontov was ordered to pay $1,500 to that roommate for his threatening behavior on a televised episode of Judge Judy. Defendants negligently hired Mr. Yontov, notwithstanding this conduct, to transport and deliver Plaintiff's household goods.

34.     Immediately upon arrival, Defendants' driver refused to open the truck until Ms. Raber had signed the Bill of Lading and paid the full remaining balance by Zelle.  She was instructed to send the money to via Zelle to the personal bank account of "Wendy," identified as the delivery driver's wife.

35.     Ms. Raber and her husband asked to speak to the driver's manager.  Defendants' agent refused to let Plaintiff speak to a manager, saying that his boss would not speak about work on Saturday for religious reasons.

36.     With her household possessions being held hostage, Ms. Raber signed the Bill of Lading under duress and reluctantly sent the demanded balance to the driver's wife's personal bank account via Zelle.

37.     Defendants' driver began unloading Ms. Raber's household possessions only after he was assured that she had made the full payment demanded by his terms and signed the Bill of Lading.

38.     During unloading, Ms. Raber and her husband realized that about half of their household goods were missing.

39.     Plaintiff again asked to speak with a manager and asked for a refund. Defendants' agent used his cell phone to call his manager but continued to refuse to let Ms. Raber or her husband speak with him, saying the manager would call them the next day not on a Saturday.

40.     Rather than allow Ms. Raber or her husband to speak with the manager already on the phone or reach out to another contact from LA Transfer, Defendants' agent stated derisively, "hasta la vista."  He then left without obtaining Plaintiff's signature on the Household Goods Descriptive Inventory.  Defendants' driver did not provide Plaintiff a copy of any updated documents regarding the partial delivery.

41.     Ms. Raber checked the missing items on the Household Goods Descriptive Inventory completed at pickup, and counted 25 of 54 total inventoried items missing, many of which were boxes filled with her possessions.

42.     Ms. Raber did not receive any communication from LA Transfer in the time promised by the driver.  She called LA Transfer several times the next day on Sunday, March 27. She received no response and her voicemail messages were ignored.  Ms. Raber also emailed LA Transfer.

43.     While unpacking the inventory Ms. Raber did receive in the partial delivery, she found a plastic bin that looked unfamiliar.  She opened the box and found a business card for another customer of Defendants.  Ms. Raber called the number shown on the business card.  She spoke with a person who said that she had hired Monster Moving to move her belongings from San Jose, California to Concord, North Carolina.  This person said that Defendant had attempted to deliver in North Carolina several items belonging to Ms. Raber, including an exercise bike, a dresser, and a stack of metal chairs.  She also informed Ms. Raber that the moving company had

lost her bicycle and the box containing the ashes of her deceased relative.  She described her experience with Defendants as "very frustrating" and "traumatizing."  Defendants' driver in North Carolina had dismissively stated, "sometimes the client stickers fall off."

44.     Ms. Raber finally reached someone at LA Transfer on the afternoon of Monday, March 28, 2022.  At this time, LA Transfer informed Ms. Raber that it had people looking for her missing items and would contact her with updates. When she asked about a partial refund, LA Transfer told her that it was out of the question because the money had already been paid to the company's main account.  Remarkably, LA Transfer's representative then instructed Ms. Raber to pack the other customer's mistakenly-delivered items in a box to assist LA Transfer with shipment of those items to North Carolina.

45.     Defendants and their agents essentially ignored Ms. Raber and her husband's pleas for help in locating their undelivered items.  Over a month later, and after several calls and emails checking for updates, Defendants concluded on April 27, 2022 that the remaining items were lost and would not be delivered.

46.     Defendants asked Ms. Raber to file a formal claim regarding her items with Defendants' moving claims service provider, Claims Service International, Inc. ("CSI"). Defendants' agent informed Ms. Raber that "[o]nce the owner reviews the claim report, he will issue compensation for the items missing."

47.     Ms. Raber submitted a formal written claim to CSI on May 17, 2022.

48.     On October 27, 2022, CSI concluded Ms. Raber's claim and offered a settlement amount of "$0.00."

49.     Ms. Raber was not advised during the claim settlement process that a dispute settlement program was available to resolve the dispute.

## COUNT I – CARMACK AMENDMENT CLAIM

50.     Plaintiff re-alleges and incorporates by reference the allegations contained in paragraphs 1 through 49.

51.     Defendants LA Transfer and Monster Moving are registered and operate as a "motor carriers" and "household goods common carriers" and are therefore subject to liability under the Carmack Amendment, 49 U.S.C. § 14706, *et seq.*

52.     Defendants Major League California and Major League Arizona held themselves out as carriers by directing the operations of other Defendants' drivers, including in directing Ms. Raber to make payments directly to a bank account controlled by the Major League Companies in contravention of the written terms of the operative Bill of Lading.  Therefore, the Major League Companies are also subject to liability under the Carmack Amendment, 49 U.S.C. § 14706, *et seq.*

53.     Defendants lost about half of Plaintiff's inventoried household goods while shipping them interstate from California to the District of Columbia.

54.     A carrier is liable for household goods that are lost, damaged, destroyed, or otherwise not delivered to the final destination is an amount equal to the replacement value of such goods, subject to a maximum amount equal to the declared value of the shipment and to rules issued by the Surface Transportation Board and applicable tariffs.  49 U.S.C. § 14706(f)(2).

55.     Under federal law, a carrier who wishes to limit liability to less than the full value of any lost or damaged cargo may do so only by the shipper's express waiver pursuant to the rules set by the Surface Transportation Board ("STB").  49 U.S.C. § 14706(f)(3).  As relevant here, a mover seeking to limit liability to less than the full value of household goods is required to place a full-length Valuation Statement on the Bill of Lading.  *Released Rates of Motor*

*Common Carriers of Household Goods*, Amendment No. 5 to Released Rates Decision No. MC-999, 2012 STB LEXIS 7, *9–10 (Jan. 12, 2012). The "only means to limit cargo liability" for a mover transporting household goods in an interstate move "is through compliance" with this STB Released Rates regulation. *Id.*, 2012 STB LEXIS at *23.

56.    Defendants failed to provide Plaintiff this selection or to collect any other written waiver of full value protection in the Bill of Lading, as required under federal law. Accordingly, Defendants are liable for the full value of Ms. Raber's lost possessions.

57.    Defendants forced Ms. Raber to sign the Bill of Lading and to pay the outstanding value of the Bill of Lading prior to the full delivery, in violation of 49 U.S.C. §13707(b)(3). Defendants' agent held Ms. Raber's household goods hostage while demanding payment to the driver's wife's personal Zelle account, refusing to first allow Plaintiff to verify the inventory being delivered. Defendants violated federal law in demanding full payment before releasing possession of a partial shipment of goods instead of prorating charges to be the percentage of the shipment delivered. 49 U.S.C. § 13707(b)(3); 49 C.F.R. § 375.407.

58.    Defendants' agent driver left the delivery location without obtaining Plaintiff's signature on delivery on the Household Goods Descriptive Inventory.

59.    Defendants refused to partially refund Ms. Raber for the prorated amount of the undelivered goods, even after acknowledging that the goods were missing and that their agent failed to obtain proper signatures.

60.    Ms. Raber and her husband have not recovered and will not recover the items that were lost while in Defendants' care. As a direct and proximate result of Defendants' wrongful conduct, Ms. Raber and her family have suffered damages. These damages include the complete loss of approximately half of her household possessions, including items with irreplaceable

sentimental value, as well as the amount wrongfully paid to Defendants for the complete delivery when Ms. Raber only received a partial delivery of her household goods.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

i.      For compensatory damages in an amount to be proven at trial, but exceeding $25,000.00;

ii.     For the reasonable attorneys' fees and costs incurred in this action as provided by 49 U.S.C. §14708(d);

iii.    For pre-judgment interest at the applicable statutory rate in the District of Columbia;

iv.     For post-judgment interest at the applicable statutory rate; and

v.      For such other further relief as the Court deems just and proper.

## JURY DEMAND

Plaintiff demands a jury trial on all issues so triable.

Dated:  October 28, 2022                               Respectfully submitted,

                                                       */s/  Anna Hrom*
                                                       Dane H. Butswinkas (D.C. Bar No. 425056)
                                                       Anna J. Hrom (D.C. Bar No. 1657785)

                                                       WILLIAMS & CONNOLLY LLP
                                                       680 Maine Avenue, S.W.
                                                       Washington, D.C.  20024
                                                       (202) 434-5000
                                                       dbutswinkas@wc.com
                                                       ahrom@wc.com

                                                       *Counsel for Plaintiff*